## THE KARO.[1]

## THE KARO v. TWO HUNDRED TONS OF SULPHUR.

*(District Court, E. D. Pennsylvania. 1886.)*

1. CHARTER-PARTY — LIEN FOR FREIGHT AND CHARGES UNDER — FRAUDULENT BILLS OF LADING.
    Where the charterer of a ship, under a charter-party giving the owners a lien on any part of the cargo for all freight and charges named therein, issues, fraudulently, a bill of lading for the goods of a third party, who had no knowledge of the charter-party, the goods so shipped are subject to the lien given by the charter-party, where the master acted in good faith.
2. SAME—EFFECT OF BILL OF LADING.
    The acceptance of cargo, as by general ship, from one ignorant of the fact that the ship is chartered, or signing bills of lading inconsistent with the charter-party, would estop the enforcement, against that part of the cargo so received, of any claim for freight, except that specified in the bills of lading.

In Admiralty.
*Morton P. Henry*, for libelant.
*Driver & Coulston*, for respondent.

BUTLER, J. There is very little, if any, dispute between the parties respecting the facts. The libelant's statement is substantially correct, and is adopted by the court. It is as follows:

This was a libel filed against part of 600 tons of sulphur shipped by the charterers at Palermo, for Philadelphia, in which the libelants seek to enforce the lien for the balance due under a charter-party between Tagliavia & Co., of Palermo, and libelants, as follows:

| | |
|---|---:|
| Charter-party freight, | £1,224 |
| Fifth port of loading, | 50 |
| Demurrage as per indorsement of Tagliavia & Co. on the charter-party at fifth port, | 30 |
| For proceeding from Boston to Philadelphia to deliver the sulphur attached, | 150 |
| | £1,454 |
| Less freight collected at Boston, | 960 |
| Balance due the ship, | £494 |

The terms of the charter-party, material to this question, are as follows: The vessel was to load at Adriatic ports and Sicily, in rotation, four places only, as ordered, and to proceed to Baltimore, Philadelphia, New York, or Boston, one port only, as ordered, on signing bills of lading. Freight was a lump sum, £1,224. The freight to be paid on unloading and right delivery of the cargo, in cash, at current rate of exchange, for bankers' 60 days' sight bills on London, on the date of reporting at customs, less cash advanced. The charterers to have the option of ordering the vessel to a second northern port of discharge on payment of £150 additional. The captain to sign bills of lad-

---

[1]Edited by C. Berkeley Taylor, Esq., of the Philadelphia bar.

ing as presented, without prejudice to this charter; owners having an absolute lien on the cargo for all freight, dead freight, or demurrage due to the steamer under this charter-party. Charterers to have the option of using one or two additional ports or places for loading in the Adriatic or Sicily. Steamer in no case to retrace her course,—paying £50 extra. The steamer to be consigned to charterers' agents at ports of loading and discharge. Demurrage over and above lay days, £25 per day.

By agreement of second February, 1886, at Catania, in consideration of the transhipment of some cargo taken on board at Fiume and Trieste for New York, Tagliavia & Co. guarantied that the ship should be sent to Boston only, without prejudice of charter-party, and that the ship should not be liable for this transhipment. Tagliavia & Co., at Palermo, loaded the ship with fruit, macaroni, and sumac for Boston, for which the master signed one bill of lading to Tagliavia & Co., deliverable at Boston, with freight as per charter-party, and all other conditions, and authorized Tagliavia & Co. to sign partial bills of lading therefor as captain's agent. Tagliavia & Co. also shipped at Palermo the 600 tons of sulphur attached. The bill of lading for the fruit was signed the day the vessel went to sea.

Tagliavia & Co. also presented, at the same time, a bill of lading to be signed by the master for the sulphur, making the same deliverable at Philadelphia. The master declined to sign such a bill of lading for the sulphur, as he had no authority to do so under the agreement at Catania, requiring the vessel only to proceed to Boston. Tagliavia & Co. assented to such refusal, and asked the master to sign a simple receipt, prepared by him, for the sulphur; and stated that he (Tagliavia) would tranship it in Boston. The receipt was: "Received on board the S. S. Karo, six hundred tons of sulphur." The transaction took place two hours before sailing from Palermo. The vessel arrived at Boston, addressed by the charterers to Messrs. Westervelt & Co., who refused to act as such for the charterer. The master then put the vessel in the hands of C. Furness & Co., of Boston, who collected the freight on the Boston cargo as called for; as set out in the partial bills of lading issued by Tagliavia & Co.

The existence of a bill of lading for the sulphur becoming known, and there being no person to receive the sulphur at Boston, the master, under the direction of his owners, proceeded to Philadelphia. Mr. Malcomson, the claimant, presented a bill of lading for the sulphur, signed by Tagliavia & Co., naming therein Fratelli Jung as shipper, and was deliverable to his order on payment of freight. It was signed, "For the Master, the Agents, TAGLIAVIA & Co.," and was indorsed, "Deliver to the Canadian Bank of Commerce, New York, or order. F. JUNG." This bill of lading was signed without any authority from the master. The master had no dealings with any one but the charterers in relation to this cargo. He had no knowledge, or means of knowledge, of the relation of F. Jung to the sulphur. The libelants claimed the balance due on the charter-party as a lien on this sulphur, which Mr. Malcomson declined to pay, and this libel was filed against a part retained for freight.

Mr. Malcomson appeared as claimant of the sulphur, and subsequently to the filing of this libel, and the delivery of the sulphur to him as claimant, he paid the freight called for by the bill of lading of Tagliavia & Co. on 600 tons, amounting to $586.80, with costs of suit up to that time, which was accepted and paid without prejudice to either party.

It was the master's right, as between himself and the charterer, to collect the entire freight secured by the contract from any part of the cargo. He might apportion it ratably to every part, and thus collect it from the whole, or allow a part to escape, and collect the entire sum from the balance. There can be no doubt of this. That such a right

was intended to be vested in him appears from every expression in the contract relating to the subject. While he bound himself to sign bills of lading as presented by the charterer, he stipulated that this signing should be "without prejudice to the charter; the owners having an absolute lien on the cargo for all freight * * * due under the charter." It was important to the master that he should not be required to apportion the freight, which would be difficult and embarrassing, even if unattended with risk; but it was of no consequence to the charterer whether it be collected from the whole or a part. Notwithstanding, however, such was the master's right, under the charter, he might waive it, or estop the enforcement of it, as respects others. The acceptance of cargo, as by general ship, from one ignorant of the circumstances, or signing bills of lading inconsistent with the charter, would doubtless estop him, as respects that part of the cargo. For the fruit, sumac, and macaroni the master did sign such bills, or rather authorized them to be signed in his name; and these bills, being transferred to others, carried this part of the cargo, subject only to the freight specified therein. The purchasers were authorized to deal on the basis of the freight specified, and would, therefore, be defrauded if required to pay more. I say this with great confidence, notwithstanding some expressions found in *Gracie* v. *Palmer*, 8 Wheat. 605. While this case goes great lengths to sustain the ship's rights, under charter, it does not, I think, contain anything calculated to cast doubt on the truth of this proposition. The master's right, therefore, is lost, as respects all the cargo except the sulphur.

Why should he not be allowed to collect the freight due from this? He did nothing to restrict or qualify his right respecting it. The bill of lading held by the respondent is fraudulent, and affects no one but the charterer, who dishonestly signed it. It serves to transfer his rights in the sulphur, but has no other effect. That the master's name was used without authority is proved, and is no longer questioned. It is urged, however, that the master was remiss in receiving the sulphur, under the circumstances attending its shipment, and thus "rendered the fraud possible." But the fraud would have been possible, and equally probable, had the master done otherwise. No care on his part could have prevented the issuance of the fraudulent bill. Had the master signed the bill presented, with proper reference to the charter, the perpetration of the fraud would not have been rendered more difficult. He could not refuse to accept the merchandise. He was bound by the contract to carry it; and when the charterer consented to take his simple acknowledgment of its receipt, and undertook to tranship it at Boston, nothing further was necessary. The transaction was complete, as contemplated by the charter.

It is assumed that the sulphur was owned and shipped by Fratelli Jung; that the master knew it, and should therefore have informed him of the charter, and its terms. But neither assumption is supported by the evidence. Not only is it not shown that Mr. Jung was the owner, but it is shown that, if he was, the master did not know it. The master swears he did not; that he never heard of such person; and this testi-

mony is unanswered. The probabilities are against the assumption of such ownership. The circumstances tend to show that the sulphur, as well as all the balance of the cargo, belonged to the charterer. The fruit, sumac, and macaroni were shipped by him, and a bill of lading taken in his name. He dealt with the sulphur as his own, had it in possession, and assumed and exercised absolute control over it. The master knew no one else in the transaction. It now appears, however, that the name Fratelli Jung was inserted in the bill presented. The master, as he testifies, did not observe this, but rejected the bill because Philadelphia was named as the place of discharge. It is probable the charterer purchased the sulphur from Mr. Jung, and intended to use the bill as a means of payment; and, being disappointed by the master's refusal, he resorted to the fraud practiced.

As before remarked, the bills of lading contemplated by the charter were intended to be used as acknowledgments merely of the receipt of cargo. An ordinary acknowledgment would have answered as well; and, when the bill for sulphur was refused, the charterer prepared and took such an acknowledgment. Wherein, then, was the master remiss? The charterer having possession of the sulphur, exercising the rights of ownership, and shipping it under the charter, the master was bound to carry it. There was nothing to call for protest or inquiry, as urged by the respondent. The same might be said if it appeared that the sulphur belonged to Mr. Jung, and the master knew it. In such case the charterer must be regarded as his agent, binding him by what was done. The agent knowing all the circumstances, and shipping the merchandise under the charter, the principal would be bound as if he had shipped it personally. A charge of remissness could more readily be sustained against the respondent, and those who preceded him as transferrees of the bill. They knew that its validity depended on the charterer's authority to execute it, and that the burden of proof respecting this rested on them. Inquiry would have revealed the fraud, and avoided the loss which has followed.

What has been said disposes of the entire case. The respondent, standing in the charterer's shoes, — having his rights, and nothing more, — must submit to payment, not only of the balance of freight due under the charter, but also to all other charges which could be enforced against the charterer; that is to say, the charges for visiting a fifth port for loading, for detention there, and for carrying the sulphur to Philadelphia. About the latter charge, I had some doubt at first, but a more familiar knowledge of the circumstances has removed it. Both shipper and respondent intended to have the sulphur carried here. The latter purchased it with a view to delivery at this port, and it is improbable that he would have consented to its discharge at Boston. Although the charterer had promised to tranship it there, he did not intend doing so, and, when the ship reached Boston, the master was seriously embarrassed by the circumstance that he could not get rid of it there. He was not required to hunt the respondent up, but was fully justified in proceeding to Philadelphia, where, as he knew, the respondent expected it.

Support for the foregoing views may be found in *Rodoconachi* v. *Milburn*, 17 Q. B. Div. 320; *Colvin* v. *Newberry*, 1 Clark & F. 283; *Pollard* v. *Vinton*, 105 U. S. 7; *Freeman* v. *Buckingham*, 18 How. 182; *Foster* v. *Colby*, 3 Hurl. & N. 705; *Gracie* v. *Palmer*, 8 Wheat. 605; *Peek* v. *Larsen*, L. R. 12 Eq. 378; Carver, Carriage by Water, 680; *Sandeman* v. *Scurr*, L. R. 2 Q. B. 86; *The St. Cloud*, Br. & Lush, 4; *Gledstanes* v. *Allen*, 12 C. B. (74 E. C. L. 201) 202; *Shand* v. *Sanderson*, 4 Hurl. & N. 381; *Small* v. *Moates*, 9 Bing. 579; *Faith* v. *East India Co.*, 4 Barn. & Ald. 630; *Gilkison* v. *Middleton*, 2 C. B. (N. S.) 134; *Mitchell* v. *Scaife*, 4 Campb. 295; Maclachlan, c. 5, p. 480; *Perez* v. *Alsop*, 3 Fost. & F. 188; *Tate* v. *Meek*, 8 Taunt. 280.

If the parties can agree upon the amount for which a decree should be entered, in pursuance of this opinion, the costs of a reference may be avoided; otherwise a commissioner must be appointed.